SHAWNEE NAT. BANK v. WOOTTEN & POTTS.

No. 96.    Opinion Filed July 13, 1909.

(103 Pac. 714.)

1.    BANKS AND BANKING—Deposits by Agent—Application by Bank—Rights of Principal. Where an agent deposits money belonging to his principal in a bank to which he himself is indebted, and the bank, without his knowledge or authority, applies the same on a debt owing by him to the bank, the principal is not debarred from recovering from the bank, where the facts disclose that the indebtedness from such agent grew out of a private business contract between them, under the terms of which specific moneys only were to be used or applied, and the fund involved did not fall within this class.

2.    APPEAL AND ERROR—Review—Harmless Error—Instructions. Where a verdict and judgment are authorized by the evidence, and another would be unwarranted, the same will not be reversed on appeal on account of errors alleged to exist in the instructions given.

(Syllabus by the Court.)

*Error from District Court, Pottawatomie County; B. F. Burwell, Judge.*

Action by Wootten & Potts against the Shawnee National Bank. Judgment for plaintiff, and defendant brings error. Affirmed.

*J. H. Woods,* for plaintiff in error.

*Shartel, Keaton & Wells,* for defendant in error, citing: *Clowers v. Snowden* (Okla.) 96 Pac. 596; *Lanfear v. Blossom,* 1 La. Ann. 148; 3 Page on Contracts, §§ 1290, 1292; 1 A. & E. Enc. L. 1004; *Burtnett v. Bank,* 38 Mich. 630; *Cady v. Bank,* (Neb.) 65 N. W. 906; *Davis v. Bank* (Tex.) 29 S. W. 926; *Bank v. Cloxton* (Tex.) 77 S. W. 44, *Douglass v. Bank,* 17 Minn. 35; *Swift v. Williams* (Md.) 11 Atl. 835.

DUNN, J. In the fall of 1904, Beatty & Stubbs were cotton buyers at Shawnee, Okla., and on the 3d day of September of that year entered into a written contract with the Shawnee National Bank, plaintiff in error, which we will hereafter designate "defendant," as follows:

"Shawnee National Bank, Shawnee, Okla—Gentlemen: We, the undersigned, Beatty & Stubbs, agree that in the opening of our account with the Shawnee National Bank this year, that same shall be conducted on the basis of spot cotton only, and that we will not engage in the speculation of buying and selling futures. It is further agreed that no profits arising from the business during the season of 1904-05 shall be withdrawn, but shall remain in said account as margins, and it is also agreed that you shall have the option at any time to close this account that it may become unsatisfactory, by the sale of any collaterals that we may have on deposit with you, at public or private sale as you may elect, and we further agree that any moneys that you may advance to us on this account shall be due and payable on March 31, 1905, and that we will close the account at that time. On account of the personal guaranty of J. M. Aydelotte on this account, we consent that he shall have exclusive control of the account through his representative, W. B. McCord, in our office, and that all checks on said account must be countersigned by Beatty & Stubbs, and signed W. B. McCord, bookkeeper. Yours respectfully, [Signed] W. H. Beatty. T. F. Stubbs. Shawnee, Oklahoma, September 3, 1904. I have read and understand the above statement. [Signed.] J. M. Aydelotte."

Under this arrangement considerable business was done by the said cotton buyers on the money of the defendants aggregating many thousands of dollars. The defendants in error, who will hereafter be called "plaintiffs," were dealers in cotton located at Chickasha. On or about the 1st of January, 1905, they bought of Beatty & Stubbs 200 bales of cotton at the agreed price of $6,-977.52. This cotton they had sold to Robert Moore & Co., of New York City. They directed Beatty & Stubbs to ship the same to their customer and draw drafts for the purchase price, in the sum of $8,718.70. These drafts, as is seen, represented the amount of money which was paid to Beatty & Stubbs, for the cotton, plus the profit of plaintiffs, which was the amount of $1,741.16, and is the sum involved in this action. Under the arrangement made between Beatty & Stubbs with the defendant, these drafts were attached to bills of lading, deposited in and forwarded by the bank. They were paid in due course of business, and credit therefor given Beatty & Stubbs for the entire amount. Thereafter plaintiffs, not receiving remittance for the profit due them, drew a draft on Beatty & Stubbs for the amount of their profit, and the said parties made their check on their account in the said bank to pay the said draft. Payment was refused on ground that Beatty & Stubbs were largely overdrawn on their account. Action was brought, and on a trial to a jury verdict was rendered in favor of plaintiffs for the sum of $1,006.50, on which judgment was entered. Motion for new trial was filed and overruled, exception saved, and the cause has, by the bank, been brought to this court by petition in error and case-made.

Counsel for defendant relies for a reversal solely upon the instructions which were given by the court to the jury. They were predicated upon the evidence, and were to the effect: That, if the jury should find therefrom that the plaintiffs had an equitable interest of $1,741.16 in the drafts, the burden was then upon the bank to show that it received them in due course of business for a valuable consideration and without knowledge of such interest. That in determining the rights of the parties they might

take into consideration the manner in which the drafts were received by the bank, and whether or not it surrendered any securities on account thereof. That, if Beatty & Stubbs received more for this cotton than it was worth, still the bank would be entitled to claim the price of the cotton. That if the bank parted with any thing of value subsequent to the time it received the drafts upon the strength of the value represented thereby, and before it received any notice of the equities of plaintiffs in the drafts, then it would be entitled to take credit for any such amounts. The notice to Aydelotte, who had charge of that branch of business, if they found that he did have such charge, would be notice to the bank. That the bank was not only chargeable with any actual knowledge which it may have had of the equities of plaintiffs in the drafts; but that if, from all of the facts and circumstances, the jury could conclude that it was in possession of knowledge of facts such as would arouse within the mind of a reasonabbly prudent person a well-founded suspicion that any one had an interest in the drafts in question other than their depositors, which, if diligently pursued, would have disclosed the interest of plaintiffs, then the bank would be charged with constructive notice. Before considering them, we will examine more fully the evidence and proof.

It is not claimed in this case that plaintiffs had any knowledge of the previous arrangement between the bank and its customers Beatty & Stubbs. It is not claimed by Beatty & Stubbs that they had any title or right to the money claimed by these plaintiffs. It is not claimed by the bank that this money belonged to Beatty & Stubbs, or that it did not belong to the plaintiffs, or was such money as under the contract was to be deposited and applied on the account between them. The claim that the bank makes is that having received it in accordance with the terms of its private contract with Beatty & Stubbs, and having applied it without actual notice of plaintiffs' rights to pay the debt owed it by its customers, it could keep it after learning that it did not belong to its customers and did belong to plaintiffs. It is not claimed

by the bank that it was misled by plaintiffs or delivered securities on account of having received this money; but it is in evidence that it was deposited just as other deposits were made, in this account under this contract, by these parties, that the same was largely overdrawn at the time it was deposited, and that it continued to be overdrawn up until the time when it was finally concluded a month or more afterward. A mere statement of these facts to our minds shows that all of the equities of the case are with plaintiffs, and that defendant has no ground upon which to predicate its claim of right to this money, except as may grow out of the statement above made, which its counsel claims finds support in the case of *Forbes v. First National Bank of Enid*, 210 Okla. 206, 95 Pac. 785. We have examined that case with care in connection with the facts presented in the case at bar; but in our judgment it is not controlling because of a fundamental difference between them. In the case mentioned, Forbes deposited a draft in the Citizens' Bank, taking credit therefor upon his passbook. The Citizens' Bank at that time was in a failing condition and was indebted in excess of the amount of this draft to the First National Bank. The First National Bank and the Citizens' Bank had been transacting an open banking business in the market of the same city, and the indebtedness grew out of the ordinary daily business banking transactions. The draft which the First National Bank received was paid to it by an officer of the Citizens' Bank, for the purpose and with the intention of paying its indebtedness to it. The Citizens' Bank claimed to own the money represented by this draft, which was a clear negotiable instrument of the highest type, and not such as the ones in the case at bar, being drafts with bills of lading attached.

Under the contract we have recited above, and by the evidence of the officials of the bank which we shall  presently notice  at length, the bank was to furnish money to Beatty & Stubbs to conduct a cotton buying and selling business. The bank received tickets and bills of lading from them to secure it for the money advanced, as well as having the personal guaranty of its vice presi-

dent. There was no money to come out of the bank under this arrangement, except that which was to be paid for cotton and for certain office expenses. There was no money to come into this fund, except that which was received by Beatty & Stubbs for the cotton in which they, the bank, and its vice-president, were engaged in dealing. It appears that the fund belonging to plaintiffs was the only instance during the season that any other money, except that which was within the contemplation of the contract, came into this fund. The bank or its vice-president did not contract for other funds to come into it, its associates did not contract that other funds should come into it or be liable to it, and the fund belonging to these plaintiffs was a total stranger to their arrangements when it arrived. It was not available to Beatty & Stubbs to liquidate their account, and it was not liable to appropriation on the part of their associates to cover an indebtedness, growing out of their private contractual relationship. Beatty & Stubbs did not pay it to the bank for the purpose of covering their indetedness to it, and, under the arrangement made, the bank was not justified in applying it.

In support of the conclusion to which we have come, we call attention to the evidence of Mr. J. M. Aydelotte, who, as we have seen, was vice president of the bank, and who had special charge of this particular account. He answered to interrogatories concerning it as follows:

"Q. The object of that whole transaction was to see, wasn't it, that no money went out of that account except what Beatty & Stubbs paid out for cotton? That was part of it? A. And the expenses of the office: yes sir. Q. And to see that whenever they were given credit that they deposited the collateral to cover it? A. Yes, sir. Q. In other words, that account was intended to represent the profit that it was supposed there would be in the cotton business of Beatty & Stubbs that year? A. The account was to represent the profit, you say? Q. Yes, wasn't it? A. It was supposed to represent the profit. Q. That is, had there been one? A. Yes, sir. Q. And that was expected there would. There was no arrangement or understanding, was there, that any money should go into that account except the money which Beatty & Stubbs re-

ceived from the sale of cotton? A. Except money received from the sale of cotton; no, sir. Not that I know of. Q. Do you know of any reason why there should have gone into that account at the time these drafts were deposited any more than Beatty & Stubbs were receiving for the cotton  A. Why there should any more money go—that is, deposit greater than what they were receiving? Q. Than their proceeds from the sale of the cotton? A. When that deposit was made, I suppose the man that took it supposed that that was the amount they received for it.  Q. Under the business as you conducted it, the amount that the bank should have got at that time was the amount that was due Beatty & Stubbs for the sale of that cotton? A. The amount of the draft. Q. Wasn't it the amount that was due them as the proceeds of the cotton? A. I didn't suppose I was to pass on what was due them, only the amount of the draft.  Q. Was there any other instance during that season where an amount went into that account that was not the amount due them for the proceeds of cotton sold? A. I don't remember. Q. You "don't remember  of any? A. No, sir.  Q. Taking that whole season's business just as you transacted it, just as is was done, shouldn't the bank on that transaction have received for deposit just the amount that was due Beatty & Stubbs for the cotton they were selling? A. They should have received the amount that the drafts called for that was deposited with them. Q. Why? A. From the fact that they had paid for the cotton that the bill of lading called for.  Q. And were entitled to the proceeds? A. And were entitled to the proceeds.  Q. They were not entitled to anything but the proceeds? A. I think not. The proceeds that the draft represented.

Mr. H. G. Douglas, who was president of the bank, and speaking of the relationship which Mr. Aydelotte held to this particular account, in answer to interrogatories, said:

"Q. Now, Mr. Aydelotte had, on behalf of the bank, general charge of this Beatty & Stubbs cotton account? A. Yes. Q. He was looking after it for the bank? A. Yes, sir."

Mr. Douglas further testified that the first that he knew of the deposit of these drafts was some two weeks after they were drawn. Mr. Jones, who was cashier of the bank, testified that $48,215 was paid out on the order of Beatty & Stubbs on this business after the deposit of $1,750 involved herein; and, in refer-

ence to the effect which this particular deposit had upon the busi-
ness between the bank and their customers, the president, on be-
ing interrogated, answered as follows:

"Q. You won't say that any one of these checks would not
have been paid just the same under the arrangement you had if
these particular deposits had been the amount that was in fact
coming to Beatty & Stubbs? A. No."

The situation presented by the contract and the foregoing
evidence to our minds takes this case out of the rule declared in
the case of *Forbes v. First National Bank, supra,* because of the
special character of the transaction and of the fact that, under
the contract between the defendant and its customers, it was not
entitled to money of this character. Its receipt or payment was not
within the contemplation of the parties. The verdict of the jury,
under the uncontradicted evidence in favor of plaintiffs, was cor-
rect, and in fact the only one to which it would have been justi-
fied in coming. Hence the judgment rendered thereon must of
necessity be sustained. This being true, it will not be necessary
for us to examine or discuss the instructions given, for, be they
right or wrong, the verdict under all of the evidence is right.
The rule in such cases is laid down in Brickwood, Sackett, In-
structions, § 190, as follows:

"Where it appears, from the evidence, that a verdict is so
clearly right that, had it been different, the courts should have set
it aside, such verdict will not be disturbed merely for the reason
that there is error found in the instructions."

Cases sustaining this text may be cited as follows: *National
Solar Salt Works v. Wemyss,* 38 Kan. 482, 17 Pac. 90; *Hazen &
Lundy v. Pierson & Co.,* 83 Ill. 241; *Burling, Adm'x, v. Illinois
Central Railroad Co.,* 85 Ill. 18; *Phillips v. Ocmulgee Mills,* 55
Ga. 633.

Finding no error in the record of which plaintiff in error is
entitled to complain, the judgment of the trial court is, according-
ly, affirmed.

Hayes, Turner, and Williams, JJ., concur; Kane, C. J.,
absent.